I am Terry Benneberg, and I represent Ms. Richardson in this case. There are three primary issues involved in this appeal. The first involves whether the blog entries by Ms. Richardson that caused her transfer addressed matters of public concern. And this court has established over the years a bright-line test for making this determination. The speech meets this test if it relates to any matter of political, social, or other concern for the community. The only speech that does not meet this test is that which involves the minutia of workplace grievances or which has no relevance to the evaluation of public agencies. Mr. Benneberg, if we were to assume that the matters about which Ms. Richardson spoke were matters of public concern and that she was speaking as a private citizen, let's assume both of those. Then we get to the Pickering balancing. And here the things that she was saying would seem to me to have a tendency to diminish her effectiveness as a coach. And what the employer did was apparently come to that conclusion and say, therefore, we're not going to have you continue with your coaching duties. You'll go back and be teaching full-time in the classroom. Now, where did the employer go to fault in the Pickering analysis, even if we give you the other assumptions? All right. Where the employer went to fault in the Pickering analysis is that the blog entries that she was actually transferred for and she was not transferred for the so-called Save Us White Boy entry because she had been previously reprimanded for that. That had been addressed by a reprimand on June 15, 2007, which incidentally was the same day that she signed the contract to continue to teach for the 2007-2008 year. So that had been resolved. The blog entries that she was transferred for were the May 20 and June 16 blog entries, which solely involved criticism of her union. It involved criticism of the impact of her union on the education that was being received by the students. There was nothing in those entries that involved any sort of confidence, any sort of betrayal, anything along those lines. And I would commend the court to those specific entries. So you're suggesting that on this record, everyone has agreed that those are the only entries that are the subject of this appeal? Those are the entries that unquestionably caused the transfer. Well, I guess my colleague's question is somewhat important to me because it seems to me that the adequate justification for treating the employee differently than other members is pretty important. And the things that your client said prior to that about those she had to coach were pretty, were not very well taken as far as having being able to do the coaching. But, Your Honor, those issues had been addressed by the reprimand. And that's something that is well established in this record. You're not saying, and I'm trying to make sure, you're not saying she got this transfer because of the blog itself, correct? That's exactly what I'm saying. And that's what Ms. Beffen says in her affidavit. Where do you argue in your brief that she received this transfer because of the blog itself, the whole blog? It seems to me we're calculating as to specific entries in the blog. That's correct. Not the blog itself. That's correct. Because she was there forever under the blog. That's correct. Okay. So you're really saying then we are to concentrate only on those two entries? Yes, Your Honor. And the reason is that it was those two entries. It was the memorandum that Cheryl Brown gave to Ms. Beffen at the record 122 to 124. Ms. Beffen says in her affidavit that that was the presentation of that memo precipitated this transfer. Now, there's been a lot of materials put into the record by the defense about trust and instructional coaching and all of that. But if the court looks at those two blog entries, the entries that actually caused this transfer, there is nothing in there. That could indicate, you know, that could give any reason for anyone to think that Ms. Richardson would not be able to perform either in the instructional coach job or the curriculum specialist job. It's simply a red herring. Let me ask you another question, which nobody seemed to focus on. And that is the third element that you have to show under Eng v. Cooley, which is that her employer took adverse employment action. What is there in this record that would suggest that the employer took adverse employment action? The best the employer did was transfer her to another job, give her the same salary, give her the same benefits, give her the same benefits, and transfer her to another job. Give her all of the things that had happened, she just did a different job that she had previously requested to do. Your Honor, we dispute that it was the same salary. What's the, you dispute the, where is that in the record, that it isn't the same salary? It is in Ms. Richardson's declaration. Tell me what difference there was, if it's there, because I read it. All we have to say is that there's a difference. The court never got to damages. And there's no question. Well, but you've got to get to the third point under Eng, which is her employer took adverse employment action. That's what consulter v. Salem suggests. Your Honor, an adverse employment action, the transfer certainly comes within the scope of that. Ms. Richardson did not seek the transfer out of this position. She did seek the transfer. She did not seek the position. She sought a transfer to be more of a teacher. She asked that she be a halftime teacher. Your Honor, I guess I would just ask a reference. Well, she did, didn't she? No, that's not. It's in the record that she sought to be a halftime teacher. And what happened was in March 2007, she was given a new job. She was given half instructional coach and half curriculum specialist. On July 26, 2007, after these events, she was taken out of that. It was called an involuntary transfer. I submit that an involuntary transfer is an adverse employment action. Clearly. It clearly is. We don't have to set the math out. What case do you set for your guide on that other than consulter? Well, I mean the good case. I focused on that because it wouldn't have been a big deal if she hadn't have asked to go back to teaching on a part-time basis in the first place. She did not ask for this transfer. That is clear from this record. July 26, 2007, indicated this was an involuntary transfer that was imposed upon her, and it was imposed upon her clearly by Ms. Beckin's own declaration. It was imposed upon her because of the blog entries. They said, you know, you can't do this job anymore because of what you've written and nobody trusts you and all of this. But that's why it's so important for this court to look at the actual blog entries. What happened here was that a union official got irritated at being mentioned indirectly of these blog entries. They went to the superintendent. They went to the human resources person, Ms. Beckin, and they said, we want this taken care of. And they told her, we will take care of it. That is in the declaration testimony. So there's no question on causation. And I would submit again that there's no question that this is an adverse employment action. If it's an involuntary transfer, that is clearly within what is considered to be an adverse employment action. Just very briefly, Your Honor, the last issue is whether these rights are clearly established. This is a pickering situation. This is exactly a pickering situation. This is a teacher protesting, giving speech about the conditions of public education. Let me ask you a question. Did the district court ever get to the qualified immunity question? They got to the qualified immunity question simply by the pickering analysis. They sort of piggybacked it and said because it doesn't meet pickering, it doesn't meet clearly established. But the key is how they got there. And they just simply, the district court simply glossed over matters of public concern. They found the speech to be salacious, mean-spirited, which has absolutely nothing to do with the First Amendment. Zero. If they got to the qualified immunity standard, then how do I get around Brewster versus the Board of Education of Linwood Unified School, which says this court has observed that the pickering test requires particularized balancing on the unique facts presented in the case. That right can rarely be considered clearly established. Right. And I think Brewster refers to a situation where it's a close call. This was not a close call. This was a matter of public concern. And she was clearly transferred because of it by Ms. Beckin's own testimony. So that's how Brewster is addressed. Thank you. Thank you. Thank you, Your Honor. Good morning, Your Honors. My name is Diana Blakeney, and I represent Gene Beckin. Is there anything in the record that would indicate that the transfer was caused by anything other than the two items that your opponent mentioned? Yes. And I direct you to the declarations of Ms. Letourneau and Ms. Nicholson found at ER 153 through 159. Ms. Letourneau, because Ms. Brown, the union representative that counsel spoke of, was too upset to actually attend the meeting with the superintendent and Gene Beckin, Letourneau attended instead. And by the time Letourneau attended, she had read multiple blog entries, as had Ms. Nicholson, who actually was faced with having to have Ms. Richardson as a coach. And after having read numerous of the entries that had spanned a number of years, the tenor of some of the commentary was such that there was a perception, and I would say a pretty reasonable perception, that trust was eroded, and trust was an essential factor for the coaching position that the school district hoped would turn their district around in terms of education. And what did the decision-maker rely on in that? There is no specific. It was clearly not just Brown being upset, because Brown was probably not at risk for being coached by Ms. Richardson. But what Ms. Brown's testimony is important as to is because of her contact with all of the other teachers as the union president, I think she's president, you know, the role of the union is very much in this because they represent 95% of the teachers roughly. The union rep has the pulse of the teachers. The union was very involved in placing and negotiating this whole coaching model with the school district. The teachers had been very dissatisfied with the prior model. They wanted complete trust. They wanted complete confidentiality. When Ms. Brown found out about the things that were said about her, she heard from other teachers. Kathy Letourneau, the vice president of the union, heard from other teachers. And, in fact, Ms. Nicholson, who was faced with having to have Richardson as a coach, was faced with meeting her one-on-one. So I think all of these matters which were discussed at the meeting with the superintendent factored into the decision. Well, the worry that I have, I guess, is Posey versus Lake Pend Oreille, which suggests that speech presenting mixed questions of private and public concern properly fall within the scope of the First Amendment. So it's important in my decision that we focus on what were the blog's entries that were the subject of the problem. If you say it's all of it, well, then it might be mixed. No, not all of it in the sense because I think Ms. Richardson is clearly a very bright woman and a very good writer. None of the blogging that had anything to do with criticism of the superintendent, criticism of her boss, factored into it. Nobody cared about it. Her boss didn't care about it. Well, what about the criticism of the union? No, not the criticism of the union. Because, as the record reflects, everybody knew already that Ms. Richardson was an outspoken critic of the union. She had verbalized that on many occasions. She was not quiet about that issue at all. It was the trust issue with the people she would end up coaching that presented the problem. She continued blogging very critically thereafter, made it very personal, very easy to identify who she was talking about. But as a teacher, that didn't affect her job. And, frankly, Posey, I think, is directed to the question of does Garcetti apply? Was this something she was paid to say to her employer? And, no, we aren't contesting this. This was clearly a blog she did on her own time. You know, using her experience, of course, as a teacher to feed it and as a curriculum specialist to feed it, but certainly on her own time. So I think there is no mixed question of fact and law that would arise out of the Posey case. I think what we're talking about is the specific commentary on people she worked with that would potentially be people who needed to trust her that caused this. If, in fact, she was transferred based on her comments about the union as such, wouldn't that be a matter of public concern? It could be. So in that instance, if it's a question of fact as to the exact reason for the transfer, have we got to send this back to the district court for a trial on the Pickering problem? Absolutely not, because even if you assume that everything she said was a matter of public interest, it relates a little bit to the case I recently submitted to the court, which name, of course, I submitted a recent case, Stengel v. Office of Dispute Resolution. It's a Pennsylvania case, but it had some interesting parallels to this case. And that is, in that case, everything that woman said was a matter of public concern. So there was no question that it was First Amendment speech, but it was not protected First Amendment speech, because she had a position where she needed to be impartial, and she needed to have an aura of impartiality. You know, maybe the comments she made in her private time wouldn't have affected her job as an administrative judge, but the perception that she might not be was sufficient to say the Pickering balance test weighs in favor of the people who decided to not renew her contract. And I think that's the situation we have here. Was it a summary judgment? Excuse me? Was it a summary judgment? Yes, it was. Yes. Thank you. And as far as the qualified immunity, there is, I think, the language is something of the nature of you have to be It's sort of the reasonable person standard. Would a reasonable person take a look at this situation and say, oh, my goodness, if I do this, if I do the involuntary transfer to a position that she, in fact, had sort of requested earlier, am I going to be violating her First Amendment rights? And I think because of the very cautious approach that was taken, there is no reasonable way Ms. Beckin could have anticipated that this would have violated her First Amendment rights. But the district court never really got to focus on that, did they? Because they really said, the district court really said, this isn't a violation at all. True. I think the Pickering They didn't talk about whether there was a violation so much as they were talking about whether it met the test that we have under First Amendment and said there is no First Amendment violation at all. Correct. Although it certainly did address the policymaker issue. She's not a policymaker, so you can't get her in her official capacity, and she's entitled, even if this were a constitutional violation, no reasonable person in her position would have suspected, and so she's entitled to qualified immunity as a personal capacity. Any other questions? Thank you. Any more questions? Okay. Thank you, counsel. And now you've taken all your time, I think. Thank you very much. Case 08-35310, Richardson v. Beckin is now submitted.
judges: Canby, Thompson, Smith N. R.